IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

MOREHEAD V. MOREHEAD

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

GREGORY A. MOREHEAD, APPELLANT AND CROSS-APPELLEE,

V.

KAREN L. MOREHEAD, APPELLEE AND CROSS-APPELLANT.

Filed September 29, 2015.    No. A-14-877.

Appeal from the District Court for Cass County: JEFFREY J. FUNKE, Judge. Affirmed.

Brandie M. Fowler and Matthew Stuart Higgins, of Higgins Law, for appellant.

Virginia A. Albers and Hannah C. Wooldridge, of Slowiaczek, Albers & Astley, P.C., L.L.O., for appellee.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

MOORE, Chief Judge.

### INTRODUCTION

Gregory A. Morehead and Karen L. Morehead's marriage was dissolved by a decree of dissolution. Greg challenges various aspects of this decree, including the court's valuation of a business he owns and operates, the alimony award to Karen, and the court's determination not to reduce Karen's alimony award or property equalization payment by the amounts Greg had paid toward her expenses during the pendency of the dissolution proceedings. Karen cross-appeals, arguing that the court abused its discretion by not awarding her attorney fees. We find the district court did not abuse its discretion in any of the ways either party asserts and affirm the decree.

### FACTUAL BACKGROUND

Greg and Karen were married in 1974 in Elk Point, South Dakota. Three children were born during the marriage and all have reached the age of majority. On March 3, 2013, Greg filed

- 1 -

a complaint for dissolution of marriage. Karen filed an answer and counterclaim, seeking the district court to require Greg to pay temporary and permanent alimony and to contribute toward her attorney fees and expert witness costs.

The district court entered a temporary order on March 21, 2013. Relying on the parties' stipulation, the court ordered Greg to pay the household expenses related to the marital home and allowed Karen to remain living in the home through the dissolution proceedings. Karen was ordered to maintain health insurance through her employer for herself and Greg. In a subsequent stipulated order, the court approved the parties' agreement that Greg would advance $3,000 to Karen for the purpose of retaining an accountant to perform a business evaluation.

Greg and Karen appeared for trial on March 26 and May 21, 2014. At the time of trial, Greg was the president and operating manager of M&M Construction, Inc. (M&M Construction) and Karen worked as a secretary in the Papillion-LaVista School District. Greg asserted that he was a partial shareholder in M&M Construction, while Karen contended that Greg was the sole owner of the company. During trial, the parties' evidence focused on Greg's ownership of M&M Construction and the valuation of that company, the division of certain personal property, and Karen's request for alimony. Additional facts regarding these issues will be provided as necessary in the analysis section below.

On August 4, 2014, the district court filed a decree of dissolution of marriage. In dividing the parties' property, the court concluded that Greg solely owned M&M Construction and the court valued the business at $484,554. The court awarded Greg his ownership interest in M&M Construction, various parcels of real estate, the parties' joint bank account, a vehicle and motorcycle, and his life insurance policy. The court also made Greg responsible for satisfying an outstanding loan. Karen received her vehicle, the parties' household goods and furnishings, a ring, a bank account, and her retirement account. Karen was also awarded certain nonmarital property which included a car and $35,000 in equity in the marital home. After dividing the property, the court ordered Greg to pay Karen an equalization payment in the amount of $300,759.11 within 180 days of the decree. After Greg makes this payment, each party will receive exactly one-half of the marital estate.

The court also determined the circumstances of the case made an alimony award appropriate. In reaching this conclusion, the court focused on the facts that the parties had been married for over 40 years, Karen's income had always been less than Greg's, Karen became a stay-at-home mother raising the children for a period of time, and Karen's monthly expenses exceeded her monthly income. The court awarded Karen alimony in the amount of $1,500 per month for 120 months.

Finally, the court ordered Greg and Karen to pay their own attorney fees. The court specifically noted that each party had incurred significant fees during the pendency of the action and a trial had been necessary to resolve various matters.

Greg appeals and Karen cross-appeals.

ASSIGNMENTS OF ERROR

Greg assigns, restated and renumbered, that the district court erred in its findings in the decree of dissolution, because it (1) incorrectly valued M&M Construction, (2) awarded Karen excessive alimony and (3) incorrectly allocated the parties' assets and debts.

In her cross-appeal, Karen assigns error to the district court's determination that each party would pay its own attorney fees.

STANDARD OF REVIEW

In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Mamot v. Mamot*, 283 Neb. 659, 813 N.W.2d 440 (2012).

A judicial abuse of discretion exists when reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Whitesides v. Whitesides*, 290 Neb. 116, 858 N.W.2d 858 (2015).

ANALYSIS

*Valuation of M&M Construction.*

In 1972, Greg's father, along with another business partner, founded M&M Construction. M&M Construction is a soil grading company and contractor. A few years later, Greg's father purchased his partner's interest in the company and became the sole owner. Greg worked for his father at M&M Construction from a young age, although he has worked a few other jobs for brief periods of time to make extra money and to alleviate marital problems. At Christmas in 1978, Greg's father and mother gifted Greg and each of his five brothers 20 shares of stock in M&M Construction. After these gifts, Greg and his brothers owned a total of 120 shares in M&M Construction while Greg's father and mother owned the remaining 130 shares. Following Greg's father's death in 1996, Greg's mother solely owned 130 shares in M&M Construction.

Greg and his brothers jointly operated M&M Construction for a few years after their father's death. However, tension developed within the family, and in 2000 Greg fired his brothers and became the sole manager and president. Because of the family conflict, Greg, his mother, and his five brothers determined that M&M Construction should repurchase the outstanding stock. Soon thereafter, the company reached separate agreements with Greg's mother and each of Greg's brothers to reacquire and retire the outstanding stock. To acquire the 130 shares of stock which Greg's mother owned, M&M Construction entered into an agreement to purchase her shares for $335,000. The agreement requires M&M Construction to make monthly payments to Greg's mother over the course of 25 years. Instead of making the monthly payments required in the agreement, however, M&M Construction has paid Greg's mother weekly. Two of Greg's brothers, Dennis and Mike, each entered into an agreement to sell their 20 shares to M&M Construction for $64,480. Greg, as president of M&M Construction, executed the two promissory notes in favor of Dennis and Mike in the amount of the sales price. Greg's three remaining brothers, Christopher,

Cletus, and Mark, entered into agreements with M&M Construction through which they received equipment, parcels of real estate, life insurance policies, or other services in exchange for their 20 shares of stock. Greg's 20 shares in M&M Construction remained outstanding at the time of trial.

Despite the agreements with his mother and brothers to sell their shares of stock in M&M Construction, Greg contended at trial that he was only a partial owner of the company. He testified that his mother still owned her 130 shares and his brothers Dennis and Mike each still owned 20 shares. However, Greg's position was contradicted by a significant amount of documentary evidence. M&M Construction's corporate tax returns from 2008 through 2011 disclose Greg to be the sole owner of the company. Only in 2012 does Greg first appear to be owner of 10.53-percent of M&M Construction. Additionally, the company's financial statements from 2008 to 2012 show 20 shares of stock outstanding and 230 shares of treasury stock. The district court concluded Greg was the sole owner of M&M Construction, a finding which Greg does not challenge on appeal. The court also determined the par value of Greg's 20 shares, $2,000, was Greg's nonmarital property. The court concluded that the balance of Greg's interest in M&M Construction was marital property, which Greg likewise does not challenge on appeal.

The court adopted the valuation proposed by Luke Northwall, the certified public accountant Karen retained to value M&M Construction. Northwall valued the company using both the income based approach and asset based approach. After determining values using each of these methods, Northwall employed a weighted average of the two methods. Then, Northwall applied a 20-percent marketability discount to arrive at the final valuation. Northwall concluded that M&M Construction's fair market value was $386,000. However, Northwall also testified that his initial valuation included a tax rate deduction of 40-percent to account for the capital gains which would be incurred upon the sale of the company. If the built-in capital gains tax reduction was removed, Northwall concluded M&M Construction's value would increase to $486,554. The district court found the value of M&M Construction to be $484,554. This figure adopts Northwall's valuation without the reduction for the capital gains tax and also subtracts $2,000 for Greg's nonmarital interest in the company.

Greg asserts the district court erred in three respects when it valued M&M Construction. First, he contends the court should have applied a discount for lack of marketability. Second, he asserts the court improperly hybridized two approved accounting methods in arriving at the company's value. Finally, Greg argues that the court should have adjusted the value of the company to reflect the capital gains tax which will be incurred when the business is sold. Greg declares that the sale of the business is imminent based on the totality of the court's judgment against him. We reject each of these arguments.

Greg's argument related to the marketability discount is refuted by the decree and Northwall's report. In the decree, the court adopts all aspects of Northwall's valuation of M&M Construction, other than the reduction for built-in capital gains at the 40-percent rate. Northwall's report clearly shows that his valuation of M&M Construction included a 20-percent discount for lack of marketability. Because a lack of marketability discount was included within the court's valuation of M&M Construction, this argument has no merit.

Greg also contends that the court's valuation of M&M Construction is improper because it hybridized two approved accounting methods. To address this argument, we again focus on

Northwall's valuation report. In valuing M&M Construction, Northwall explained that he utilized both the income approach and the asset based approach. The income based approach estimates the value of a company by considering the income generated by the assets over a period of time. This approach is based on the principle that the value of a business is equal to the present worth of the future benefits of ownership. Northwall employed the capitalization of earnings method to determine that M&M Construction's value was $523,000 under the income approach. In the asset-based approach, the evaluator places emphasis on the fair market value of the assets and liabilities of a business. This asset-based valuation method is used when the business being evaluated has no established earnings history, a volatile earnings/cash flow history, a questionable ability to continue without the infusion of additional cash investment, can only be sold as an asset based purchase on a piecemeal basis, or provides a realizable value that is greater than other methods of valuation. Under the adjusted net assets valuation method, Northwall determined M&M Construction's value was $456,000.

Having valued the company according to each of these two methods, Northwall determined that a weighted method was most appropriate for estimating the fair market value of M&M Construction. In creating a weighted average, Northwall gave the capitalization of earnings method 40-percent weight and the adjusted net assets method 60-percent weight. Northwall further explained that this weighted method is not an exact science and he provides mathematical values to assist the reader of the report to interpret the evaluator's "thinking" as to the relative emphasis given to each valuation method. Northwall further disclosed that the factors that influence the appropriate degree of emphasis for different valuation methods could change over time. Applying this weighted method, Northwall valued M&M Construction at $386,000 after reducing the value for capital gains tax, or $486,554 without the reduction.

Greg contends this hybrid method of valuation was not mentioned at trial. However, this contention is clearly refuted by the record. As noted above, Northwall testified that he averaged the capitalization of earnings method with the adjusted net asset method to reach his conclusion as to the value of M&M Construction. Additionally, Northwall disclosed in his report that he reached his valuation by employing this weighted valuation method. Karen shared this report with Greg prior to trial and the parties stipulated to the admission of Northwall's report into evidence. Thus, the record demonstrates that the court did not improperly hybridize two approved valuation methods because it simply relied upon Northwall's valuation method. Further, Northwall's weighted valuation method was disclosed in advance of trial and during the trial. Greg did not object to Northwall's valuation method at any time and he did not offer any other expert valuation. This argument is without merit.

Greg's final argument relates to the court's decision to value M&M Construction without applying a reduction for capital gains tax. Greg contends that such a reduction is necessary because the sale of M&M Construction has become a "foregone conclusion" after the district court divided their property and awarded Karen alimony. In response, Karen argues that the evidence received at trial does not demonstrate that such a sale is imminent.

In *Schuman v. Schuman*, 265 Neb. 459, 658 N.W.2d 30 (2003), the Nebraska Supreme Court addressed whether tax consequences resulting from the sale of a business should be considered in the division of marital property. The Supreme Court held that in assigning a value

to a business for purposes of dividing the property in an action for dissolution of marriage, a trial court should not consider the tax consequences from the sale of the business unless the trial court makes a finding that the sale of the business is reasonably certain to occur in the future. See *id*. The court further stated that trial courts are permitted to consider such tax consequences if they find that a property division award will effectively force a party to sell a business in order to meet the court-imposed obligations. See *id*.

This court had the opportunity to apply the rule announced in *Schuman* when it decided *Shuck v. Shuck*, 18 Neb. App. 867, 806 N.W.2d 580 (2011). In that case, the expert's valuation of the husband's ownership interests in family businesses included a reduction for expectancy of taxes. Specifically, the expert's valuation of the family businesses included a uniform 40-percent "assumed" tax rate for purposes of quantifying the "built-in taxable gain adjustment", or the depreciation recapture or capital gains that would be recognized upon the sale of the assets of the entities. *Id*. at 882, 806 N.W.2d at 592. However, there was no evidence in the record, and no finding by the trial court, that a sale of any of the family businesses was reasonably certain to occur in the near future. *Id*. Therefore, because of this lack of evidence that a sale was imminent, we concluded the trial court abused its discretion in reducing the value of the husband's family businesses for expectancy of taxes.

We reach the same result in this case as we did in *Shuck*. There is simply no evidence in the record which establishes that Greg will have to sell M&M Construction in the near future. On the contrary, his testimony at trial established that he had no immediate intention to sell the company. Karen also testified that Greg had told her during the marriage that he planned to work at M&M Construction for the rest of his life. The district court did not abuse its discretion when it determined that the value of M&M Construction should not be reduced for potential capital gains taxes.

*Alimony*.

Greg argues that the trial court erred in requiring him to pay Karen $1,500 per month in alimony commencing July 1, 2014, and continuing for 120 months, or until Karen's remarriage, or the death of either party, whichever occurs first. At the time of trial, Greg was 63 years of old and Karen was 59. If Greg pays the entire award, he will pay $180,000 over 10 years. Greg asserts that when the alimony award is considered along with the property division, the overall result is unfair, unreasonable, and will force him to continue working until he dies in order to satisfy the award.

In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties; (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015). In addition to the specific criteria listed in Neb. Rev. Stat. § 42-365 (Reissue 2008), in dividing property and considering alimony upon a dissolution of marriage, a court should consider the income and earning capacity of each party and the general equities of the situation. *Id*.

In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Id*. The primary purpose of alimony is to assist an ex-spouse for a period of time necessary for that individual to secure his or her own means of support. *Id*. The ultimate criterion is one of reasonableness. *Id*.

Greg and Karen's marriage lasted over 40 years. During their marriage, they raised three children to the age of majority. While the children were young, Karen assumed the majority of the household responsibilities which came with raising the children while Greg focused on earning income. During his testimony, Greg admitted that he and Karen had different responsibilities at this time during their marriage and Karen handled the diaper changes, meal preparation, laundry, and housecleaning. However, Greg also testified that he helped Karen with the grocery shopping and did other work on the family home including moving the home and putting additions onto the basement.

After their children began attending school, Karen worked at a number of different jobs. Karen has been employed as the morning clerk at a convenience store, as a receptionist in a dental office, as a paralegal in a law firm, in a cleaning business with Greg's cousin, in the office at M&M Construction, as a fitness instructor, and as a secretary at the Papillion-La Vista School District. In addition to her various jobs, Karen has also taken singing and piano lessons, received training as a court reporter and paralegal, and taken classes in mixology and massage therapy during the marriage. Throughout her series of employment, Karen's income has remained far less than Greg's. At the time of trial, Karen's annual salary in her position as a secretary with the school district is $25,444.96. Since her separation from Greg, Karen's estimated monthly expenses have exceeded her monthly income.

Greg has worked for M&M Construction for the majority of his life and receives both weekly and monthly payments from the company. He testified that he receives a weekly check for $337.51 along with one monthly payment of $1,691. In addition to his wages, M&M Construction also pays Greg approximately $888 in monthly rent for the use of the shop building which is located on land Greg personally owns. When Greg's wages and rental income are added together, his net monthly income totals approximately $3,610. M&M Construction also provides Greg with a company vehicle, along with fuel, insurance, and maintenance for that vehicle, and pays for his cellular phone.

As president and operating manager of M&M Construction, Greg has reinvested the profits back into the company. Greg testified that M&M Construction has not paid any dividends, or money of any sort, since he assumed control of the company in 2000. In 2013, M&M Construction's corporate financial statement shows that the company's checking account had a balance of $122,093 and the company's retained earnings totaled $875,424. Further, in the period from 2008 to 2012, the company's retained earnings have varied from a high of $965,220 in 2008 to a low of $729,621 in 2011. Because Greg is the president and sole shareholder of M&M Construction, and has full control over the distribution of retained earnings, the district court correctly considered the company's retained earnings when determining Greg's income for alimony purposes.

We have considered all of the factors involved in an alimony award in light of the particular facts of this case. We conclude that the district court did not abuse its discretion when it awarded Karen alimony in the amount of $1,500 per month for 120 months.

In reaching the conclusion that the alimony award was not an abuse of discretion, we also reject Greg's arguments that the property division and alimony award will require him to sell M&M Construction. There is simply no evidence in the record supporting this conclusion. Greg's testimony reveals that he plans to continue working at the company following the divorce.

*Allocation of Assets and Debts.*

Although Greg assigns error to the court's allocation of the parties' assets and debts, his argument focuses on the fact that the court did not credit him for the payments he made toward Karen's expenses during the pendency of this action. He claims that he should be awarded credit for these payments due to the large equalization payment he must make and the amount of alimony the court awarded to Karen.

Greg does not cite to, and we are not aware of, any Nebraska appellate court decision which requires courts to credit a party for payments made under a temporary order prior to dissolution. The temporary order was in the nature of support for Karen during the pendency of the dissolution proceeding. We cannot find that the district court abused its discretion in failing to credit Greg for the amounts he paid toward Karen's expenses during the pendency of the action.

*Attorney Fees.*

In her cross-appeal, Karen contends the district court should have awarded her attorney fees. She asserts that Greg advanced a theory at trial that his interest in M&M Construction was nonmarital because he acquired the company by gift from his parents. The district court rejected this position and determined Greg was the sole owner. Because Greg does not contest the court's determination related to the ownership of M&M Construction on appeal, Karen claims that Greg's position at trial was frivolous and unworthy of appeal. Karen requests this court to award her attorney fees based upon the affidavit submitted to the district court at trial.

The district court did not abuse its discretion when it ordered each party to pay its own attorney fees. In a marital dissolution action, an award of attorney fees depends on a variety of factors, including the amount of property and alimony awarded, the earning capacity of the parties, and the general equities of the situation. *Molczyk v. Molczyk*, 285 Neb. 96, 825 N.W.2d 435 (2013). In this case, the district court attempted to equally divide the parties' property and awarded Karen a significant property judgment and a lengthy award of alimony. The court further stated that a trial was necessary to resolve various issues and the court did not find that any of the issues contested at trial were frivolous. Karen's cross-appeal is without merit.

## CONCLUSION

The district court did not abuse its discretion when it valued M&M Construction, awarded alimony, or did not deduct Greg's payments towards Karen's expenses during the pendency of this

action. Similarly, the court's determination that each party would be responsible for its own attorney fees was not an abuse of discretion.

AFFIRMED.